STATE of Wisconsin, Plaintiff-Respondent,

v.

Richard J. ANTHUBER, Defendant-Appellant.†

Court of Appeals

*No. 95–1365–CR. Submitted on briefs March 1, 1996.—Decided April 3, 1996.*

(Also reported in 549 N.W.2d 477.)

†Petition to review denied.

513

On behalf of the defendant-appellant, the cause was submitted on the briefs of *James C. Reiher* and *Timothy W. Feeley* of *von Briesen & Purtell, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Paul Lundsten*, assistant attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

BROWN, J. Richard J. Anthuber is a heroin addict. He was convicted on one count of heroin possession after prison officers found him injecting himself in his cell at the Racine Correctional Institution. Anthuber primarily contends that the trial court erred when it rejected his necessity defense. He specifically asserts that his illegal drug use was made necessary by the Department of Corrections (DOC) depriving him of the methadone it promised to provide. We hold, however, that Anthuber was not entitled to this defense because the addiction which drove him to inject heroin on this occasion ultimately rested in his conscious decision to start using illegal drugs. We also reject Anthuber's claims of prosecutorial misconduct and double jeopardy, and therefore affirm his conviction.

In March 1993, Anthuber was a resident at a halfway house. At the time, he was on parole for a forgery conviction and had recently entered a

methadone treatment program at the Medical College of Wisconsin. Despite these efforts at recovery, Anthuber left the halfway house because he believed that the DOC suspected him of illegal drug use and thus feared that his parole would be revoked.

Through his counsel, Anthuber negotiated with his parole agent and arranged to turn himself in by June 22, 1993. Before that time, he had arranged to participate in a different methadone treatment and detoxification program.

The DOC nonetheless took Anthuber into custody earlier than he expected. It acted on the basis of Anthuber's suspected drug use back in March.

Anthuber was first taken to the Milwaukee County Jail on June 10, 1993. There he was initially permitted to continue his methadone treatment, but was told that his dosage was going to be rapidly decreased and that treatment would end by July. Anthuber was scheduled, however, to serve a sentence through early October. So, the DOC made Anthuber an offer. If he agreed to a transfer to the Racine Correctional Institution, he would be allowed to maintain his methadone treatment during the entire term of his sanction.

Unfortunately, as a result of what the State acknowledges was a "mistake" by DOC personnel, Anthuber was not provided with methadone when he entered Racine. Although he tried, through counsel, to get the DOC to live up to the transfer agreement, the health officers at Racine could not cooperate because the facility was not certified to administer methadone.

On August 7, a prison guard caught Anthuber injecting heroin into his foot. Anthuber was subsequently found in violation of prison rules and his sentence was adjusted as part of the administrative

sanction. He was released from Racine Correctional on November 5, 1993.

The State filed charges against Anthuber in February 1994. At the bench trial, the court rejected his various defenses and found him guilty of heroin possession. It sentenced him to one year of probation.

In this appeal, Anthuber raises the following three claims. First, he contends that the DOC's refusal to provide him with methadone treatment created a situation which compelled him to temper his drug addiction through illegal heroin use. He argues that he has thus met his burden of establishing the necessity defense outlined in § 939.47, STATS. Second, Anthuber claims that the State abused its prosecutorial discretion. Here, he renews his complaint that the DO C's mistakes forced him back to illegal drug use and that the State should therefore be precluded from prosecuting him. Finally, he argues that the State's criminal charges are barred because he had already been sentenced for this particular incident by the DO C's administrative system. We will address each of these arguments seriatim.

██

We begin with a synopsis of the necessity defense. The basic theory supporting it is that a person should not be punished for violating a law when the person faced the choice of either breaking the law or enduring some greater harm. *See generally* 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 5.4 (1986). A classic application would involve the ambulance driver who defends a speeding ticket with evidence that she or he was rushing someone to the hospital. *See id.* at § 5.4(c).

In some jurisdictions, the defense remains part of the common law. In others, and Wisconsin is an

example of this class, the legislature has made some basic policy conclusions about how this defense should be applied. Here, the political process has outlined what "harms" are so great that the need to avoid such a force may excuse a person from the reach of the criminal law. *See id.* at § 5.4(a) n.10.

We now face the issue of whether Anthuber's circumstances fit the necessity defense set out in § 939.47, STATS. This presents a question of law because we are simply applying a statute to a set of undisputed facts. *See First Nat'l Leasing Corp. v. City of Madison,* 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977). Since Anthuber and the State submitted a stipulation of facts, we depart from the general rule that affords trial courts the discretion to determine what instructions the evidence reasonably requires. *See State v.*

In *State v. Olsen,* 99 Wis. 2d 572, 299 N.W.2d 632, (Ct. App. 1980), the court identified the four elements which comprise the § 939.47, STATS., necessity defense:

(1) the defendant must have acted under pressure from natural physical forces;
(2) the defendant's act was necessary to prevent imminent public disaster, or death, or great bodily harm;
(3) the defendant had no alternative means of preventing the harm; and
(4) the defendant's beliefs were reasonable.

*See id.* at 577-78, 299 N.W.2d at 635-36; *see also* WIS J I—CRIMINAL 792.[1] We first consider the dispute over

---

[1] This jury instruction defines only three parts to the necessity defense. It combines the second element, prevention of great harm, and the third element, no alternative means, into

whether Anthuber's heroin addiction is a "natural physical force."

On this first factor, the State argues that Anthuber was not entitled to the necessity instruction as a matter of law since *he* was responsible for the drug use that led to his addiction. But supported by a medical expert who testified about the biological and psychological effects that heroin (methadone) withdrawal can have on a human, Anthuber responds that these "serious adverse effects" are a "natural physical force." In essence, he claims that the natural force of his addiction caused him to inject the heroin, not a conscious desire to get high.

When we look at the *Olsen* decision, it seems that the court identified two elements within a "natural physical force." First, as the State suggests through its argument, the reviewing court must gauge who or what set the "force" in motion. For instance, people cannot claim that violating the law is necessary to protect themselves from some human (as in artificial) activity because our society has other means of preventing this type of harm. Thus, the *Olsen* court held that protecting society from the potential hazards of radioactive waste was not covered by the necessity defense because government provides us with any needed protection. *See Olsen*, 99 Wis. 2d at 576, 299 N.W.2d at 634-35. Since Anthuber's decision to engage in drug use was the primary cause of his addiction, this facet of *Olsen* suggests that heroin addiction cannot be

the single question of whether the defendant believed that his or her act was the *only* means of preventing the great harm. *See* WIS JI—CRIMINAL 792 (emphasis added). While we find no substantive difference in the two tests, we nonetheless believe that the four-part test is simpler to understand and discuss.

a "natural physical force" because it arises out of conscious human activity.

However, the *Olsen* court also suggested that wildfires and shipwrecks could constitute a "natural physical force." *See id.* at 576, 299 N.W.2d at 634. Because these events could as easily stem from human error (or an evil choice) just as easily as they could arise from an act of God, the court added that whether the "force" can be controlled must also be considered. *Id.* at 576, 299 N.W.2d at 635.

Applying these two factors, we hold that the "force" affecting Anthuber was not a "natural physical force" because he set it in motion when he made the decision to start using heroin *and* there is no evidence that he had no control over whether to make this initial choice.

Because Anthuber has failed to meet the first prong of the *Olsen* test, we need not address the other three elements. *See id.* at 578-79, 299 N.W.2d at 635-36. We conclude that the trial court correctly declined to consider this defense.

We observe, nevertheless, that our analysis of § 939.47, STATS., does not preclude a person from asserting a medically-related necessity as a defense. For example, had Anthuber shown that he was not responsible for his addiction, then the biological effect that withdrawal had on his mind and body could constitute a "natural physical force." Hypothetically, Anthuber could have become addicted to opiates because of negligent medical treatment. In such circumstances, a necessity defense might apply because he would not have been the responsible party for his condition.

■

We next turn to whether the State is guilty of outrageous government conduct. Here, Anthuber argues that the State abused its discretion when it prosecuted him for conduct which arose out of its agency's mistaken decision to place him at an institution where methadone treatment was unavailable. In essence, he urges this court to hold that the State's decision to charge in such circumstances constitutes "outrageous government conduct" and accordingly dismiss his conviction. *See United States v. Russell*, 411 U.S. 423, 431-32 (1973) (describing how Due Process Clause may bar prosecuting an offense attributable to outrageous conduct by law enforcement agents). Whether the State's conduct is "outrageous" is a question of constitutional fact that we review independently. *See State v. Hyndman*, 170 Wis. 2d 198, 207-08, 488 N.W.2d 111, 115 (Ct. App. 1992).

Anthuber paints a sympathetic picture. The evidence does support his position that the DOC's refusal to provide him methadone was a major factor leading to his return to illegal drug use. The trial court indeed acknowledged that "[t]his man's had some problems and he's dealing with the problems."

■

But for this court to grant Anthuber's request, and interfere with the State's broad discretion in choosing to prosecute a crime, we must be satisfied that the State was "enmeshed in criminal activity." *See State v. Gibas*, 184 Wis. 2d 355, 362, 516 N.W.2d 785, 787 (Ct. App. 1994), *cert. denied*, 115 S. Ct. 729 (1995). The evidence, even in the light most favorable to Anthuber, only reveals that the State's conduct amounted to an administrative blunder. While we are hesitant to effectively excuse the State's mistake because the

mistake has resulted in some serious ramifications for Anthuber, such conduct is not so egregious as to warrant our interference in the State's law enforcement power. *Compare, e.g., Bray v. Peyton*, 429 F.2d 500, 501 (4th Cir. 1970) (concluding that the government's arrest of a defense witness immediately before trial interfered with due process).

■

Finally, Anthuber complains that the State has violated the Double Jeopardy Clause by "prosecuting, convicting and sentencing" him for the same conduct that the DOC relied on to extend his mandatory release date from Racine Correctional. *See* § 302.11(2), STATS. He specifically relies on the concurring opinion to *State v. Fonder*, 162 Wis. 2d 591, 606, 469 N.W.2d 922, 929 ( Ct. App.), *cert. denied*, 502 U.S. 993 (1991), where Judge Sundby suggested that extension of a mandatory release date could be a "punishment" for the purposes of a double jeopardy analysis.

We hold, however, that the State has not violated the Double Jeopardy Clause. We are bound by the majority opinion in *Fonder* which held that inmates are not subject to double jeopardy when they are criminally prosecuted for conduct which was also the basis for this type of DOC administrative sanction. *See id.* at 598-99, 469 N.W.2d at 926; *accord Garrity v. Fiedler*, 41 F.3d 1150, 1152-53 (7th Cir. 1994) (affirming denial of habeas corpus), *cert. denied*, 115 S. Ct. 1420 (1995).

*By the Court.*—Judgment affirmed.